UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

YOHAN BALCACER,

        Petitioner,

v.

PATRICK NOGAN,

        Respondent.

Civ. No. 19-22029 (KM)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.**

**I.    INTRODUCTION**

Pro se petitioner Yohan Balcacer petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. DE 6. He challenges his 2014 conviction for his role in an attempt to rob undercover agents he believed to be drug dealers. For the reasons below, the petition is denied and a certificate of appealability shall not issue.

**II.    BACKGROUND**

    **A.  Factual Background**[1]

On direct appeal, the Appellate Division summarized the evidence underlying Balcacer's conviction as follows:

> In October 2011, the Bergen County Prosecutor's Office, Narcotics Task Force (NTF), received and acted upon information that Jose B. Rodriguez was involved with heroin distribution. Detective Michael Perez of the NTF contacted Rodriguez and posed as an interested buyer. Perez and Rodriguez had numerous conversations which resulted in an agreement whereby Rodriguez would sell Perez two kilos of heroin for $100,000. A meeting was set for the transaction on October 18, 2011, at the Hampton Inn in Ridgefield Park.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), this Court affords deference to the factual determinations of the State court.

The NTF held a briefing on the morning of the planned transaction. Perez was equipped with a recording device and transmitter so that backup officers could monitor the conversation between Perez and Rodriguez. Perez prearranged a distress signal should he require assistance from the backup officers.

Meanwhile, Rodriguez was at his home in Union City waiting for a ride to the Hampton Inn. Rodriguez met defendant and Ronald Greene at the intersection of New York Avenue and 32nd Street in Union City at around 10:30 a.m. Defendant was driving a gray Toyota Camry with New York license plates. While driving to the motel, the men discussed their plan. Once Perez offered the money to Rodriguez, the others would steal back the drugs and flee.

At approximately 11:45 a.m., other backup officers arrived at the Hampton Inn to secure a vantage point. Perez spoke to Rodriguez indicating he was en route. Rodriguez advised Perez that he was also en route. At this time, backup officers observed a silver Chevrolet Malibu with New Jersey license plates and a gray Toyota Camry driven by defendant enter the parking lot. The backup officers observed Rodriguez exit the Camry, walk to the hotel's front entrance, and sit on a bench. The backup officers advised Perez that Rodriguez had already arrived.

Perez arrived at the Hampton Inn approximately twenty-five minutes later, parked his car in the center of the lot, and phoned Rodriguez to coordinate a meeting place. Rodriguez walked to Perez's car, entered the passenger-side door, and handed Perez a sample of a tan, powdery substance. Perez suggested he leave with the sample to test the quality and then would meet with Rodriguez in an hour to pay for the heroin. Rodriguez agreed with the suggestion and exited the vehicle. Perez then drove to a predetermined location where he met with Sergeant Anthony Martino of the NTF. A field test was conducted which confirmed the substance to be heroin. Perez advised Rodriguez by phone that he would return at 1:00 p.m. with the $100,000.

While this was occurring, the Malibu left the Hampton Inn and proceeded to an Exxon gas station. Defendant remained at the Hampton Inn, and Rodriguez exited the Camry holding a package that he placed in bushes near the hotel. Shortly thereafter, the Malibu returned to the Hampton Inn, parking in the rear lot.

Perez returned to the Hampton Inn and approached Rodriguez, who was sitting on a bench near the main entrance. Rodriguez and Perez walked to the bushes where the plastic bag was located. Perez opened the bag and observed a tan, powdery substance similar to the sample. Rodriguez then inquired about the money. Perez responded that it was in his car. As Rodriguez and Perez walked back towards the car, the Malibu approached from the rear of the hotel moving slowly past Perez, with both Brandon Segar and Greene staring at him. The Malibu then parked next to Perez's car. Perez was approached by Greene who racked the slide on a handgun and, from two feet away, pointed it at Perez's head. Perez ran toward the rear of the hotel yelling "gun." Perez remained at that location until he was met by a backup officer.

2

> Greene tried to open Perez's car when members of the Bergen County Sheriff's Department, Criminal Investigation Unit, converged on the scene. Greene threw the gun under Perez's car and attempted, without success, to enter the Camry as it sped away.
>
> The Camry's license plate was broadcast over the State Police Emergency Network (SPEN). A Leonia police officer saw defendant's car heading east on Route 46, activated his vehicle's lights and siren, and engaged in a pursuit. Defendant was weaving in and out of traffic while passing cars on the shoulder of the road. While driving across the George Washington Bridge, the police officer estimated defendant's car reached speeds in excess of 100 miles per hour. Once defendant crossed into the Bronx, the police officer broke pursuit. An arrest warrant was issued for defendant's arrest. He was ultimately apprehended on October 20, 2011.

*State v. Balcacer*, No. A-0264-14T3, 2016 WL 6694601, at *1–2 (N.J. Super. Ct. App. Div. Nov. 15, 2016) (citations omitted).

### B.  Procedural History

A state grand jury returned a 24-count indictment charging Balcacer, Rodriguez, Segar, and Greene with various offenses arising from the facts recounted above.[2] After a 10-day jury trial, which took place between February and March 2014, Balcacer was convicted of third-degree possession with intent to distribute an imitation drug and second-degree eluding, and acquitted on all other counts. *Balcacer*, 2016 WL 6694601, at *2. He was sentenced to four years of imprisonment with two years of parole ineligibility for possession of an imitation drug, and to a consecutive eight-year term of imprisonment with four years of parole ineligibility for eluding. *Id*. The Appellate Division affirmed in 2016. *Balcacer*, 2016 WL 6694601, at *4. Certification was denied in 2017. *State v. Balcacer*, 229 N.J. 157, 160 A.3d 706 (2017).

---

[2] Specifically, Balcacer was charged with: second-degree conspiracy to commit robbery, third-degree distribution of a controlled dangerous substance, second-degree conspiracy to distribute a controlled dangerous substance, third-degree possession with intent to distribute an imitation drug, first-degree armed robbery, second-degree possession of a weapon for an unlawful purpose, second-degree possession of a handgun with the requisite permit, fourth-degree possession of a defaced firearm, second-degree possession of a firearm while committing a drug offense, second-degree eluding, and second-degree certain persons not to have weapons. *Balcacer*, 2016 WL 6694601, at *2.

Balcacer petitioned for post-conviction relief ("PCR") in March 2017, arguing, among other things, that his trial counsel was ineffective for (1) failing to request a *Wade* hearing,[3] (2) preventing him from testifying at trial, and (3) deciding not to call certain alibi witnesses. *Balcacer*, 2019 WL 2713129 at *1; DE 16-8 at 35. At a January 2018 PCR hearing, the PCR judge, who was also the trial judge, found that (1) given Balcacer's co-defendant's acquaintance with him, any challenge to identification would have been futile; and (2) as the judge recalled discussing with Balcacer (i) his waiver of his right to testify, and (ii) his request that the jury be given the relevant model jury charge, the record did not support a claim that his waiver of his right to testify was not knowing and intelligent. *Id*. After an April 2018 evidentiary hearing, the PCR court further found that counsel had not been ineffective for failing to call two alibi witnesses because the purported alibi witnesses' testimony was not credible. *Id.* at *2; DE 16-9 at 27. The Appellate Division affirmed in June 2019. *State v. Balcacer*, No. A-5117-17T4, 2019 WL 2713129, at *1 (N.J. Super. Ct. App. Div. June 28, 2019). Certification was denied in November 2019. *State v. Balcacer*, 240 N.J. 162, 220 A.3d 1005 (2019).

Balcacer filed his initial habeas petition in December 2019, citing his state court filings but failing to articulate grounds for relief or supporting facts as required by 28 U.S.C. § 2254 Rule 2(c). DE 1. I thus dismissed that petition, and in so doing explained the deficiencies. DE 3. His next filing (DE 4) did not correct the deficiencies (DE 5), nor did the filing after that (DE 6). Balcacer instead advised the Court that his state court filings, which he had attached to his petition, "explain everything." *Id.* at 6. I reviewed those state court documents (DE 6) and in a

---

[3] Discussed in greater detail below, "[a] *Wade* hearing occurs when a question arises concerning an identification procedure that has possibly violated a constitutional right. The hearing is made outside the presence of a jury, and concerns not the in-court identification, but only the pre-trial identification." *United States v. Stevens*, 935 F.2d 1380, 1386 (3d Cir. 1991) (quotation marks and citation omitted); *see also United States v. Wade*, 388 U.S. 218 (1967).

4

January 2022 memorandum order I (1) advised him of the claims I believed he was asserting, (2) gave him 30 days to supplement or clarify his grounds for relief, and (3) advised him that if no response was received he would "be bound by his current petition as I have interpreted it." DE 9 at 2. No response was received.

The operative habeas petition therefore is docket entry 6 (the petition filed on May 14, 2020), and the asserted grounds for relief, as articulated in my January 2022 memorandum order and reflected in the state documents attached to Balcacer's petition, are as follows: (1) trial counsel was ineffective for failing to file a timely notice of alibi and failing to elicit a complete alibi, and appellate counsel on direct appeal was ineffective for failing to pursue trial counsel's ineffectiveness (DE 6-6 at 12); (2) trial counsel was ineffective in failing to seek a *Wade* hearing to challenge the eyewitness identification of Balcacer (*id.* at 22); (3) Balcacer was "coerced into forgoing his testimony due to trial counsel's ineffective representation" (DE 6-5 at 6); and (4) the "cumulation of errors by trial counsel resulted in a fundamentally unfair process" (*id.*). DE 9 at 2. The State answered in October 2022. DE 16. Balcacer did not file a response. This matter is therefore fully submitted and ready for decision.

## III. LEGAL STANDARDS

### A. Habeas Review Generally

The district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A habeas petitioner must establish entitlement to relief for each claim in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846

(3d Cir. 2013). Federal district courts must be "highly deferential" to the determinations of state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

If the state courts have adjudicated a claim on the merits, the district court shall not grant a writ of habeas corpus unless that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is "clearly established" for these purposes if it is clearly expressed in "the holdings, as opposed to the dicta" of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id*. If a petitioner challenges an allegedly erroneous state court factual determination, that determination "shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The relevant state court decision for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008). These deferential standards apply "even where there has been a summary denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).

### B. Habeas Review of Ineffective Assistance of Counsel

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). A claim of ineffective assistance has two necessary components. *Id*. at 687. First, the

defendant must "show that counsel's representation fell below an objective standard of reasonableness," *id.* at 687–88, meaning he "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Second, a petitioner must establish prejudice, i.e., a reasonable probability that the result of the trial would have been different absent the deficient act or omission. *Id.* at 687. Further, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697).

On habeas review, it is not enough that a federal judge would have found counsel ineffective; the judge must also find that the state court's resolution of the issue was unreasonable, a higher standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "And while judges may be tempted to second guess defense counsel's decisions, we must keep in mind that advocacy is an art and not a science, and . . . strategic choices must be respected in these circumstances if they are based on professional judgment." *Gaines v. Superintendent Benner Twp. SCI*, 33 F.4th 705, 712 (3d Cir. 2022) (quotation omitted). In other words, "counsel's strategic choices will not be second-guessed by *post-hoc* determinations that a different trial strategy would have fared better." *Rolan v. Vaughn*, 445 F.3d 671, 681–82 (3d Cir. 2006).

## IV.   DISCUSSION

### A.  Alibi Claim

Balcacer argues that his trial counsel was ineffective for failing to call witnesses who would have testified "that [he was] not at the crime scene at the time of the robbery/conspiracy, but was in New York." DE 6-6 at 14. He asserts that trial counsel failed to contact these witnesses and file a timely notice of alibi. *Id.* at 12. He further argues that appellate counsel on direct appeal was ineffective for failing to raise trial counsel's alleged ineffectiveness. *Id.* The

7

PCR court rejected this claim, finding that trial counsel's decision not to call alibi witnesses was tactical. DE 16-9 at 27.

At the April 2018 evidentiary hearing, the PCR court heard testimony from Balcacer; his trial counsel, Genesis Peduto;[4] and two purported alibi witnesses, Bilina Rivas and Luis Balcacer, who are Balcacer's aunt and brother. DE 16-9 at 27. Bilina and Luis both submitted affidavits in support of Balcacer's PCR petition stating that Balcacer was in New York on the date of the crime. DE 6-6 at 33–34. The court summarized the relevant hearing testimony as follows:

> Prior to Bilina Rivas being sworn, petitioner's PCR counsel advised the court she suffered from dementia and possessed limited memory of the events of the trial in 2014 or the events of the incident in 2011. . . .
>
> Bilina, petitioner's aunt, who speaks only Spanish, testified through the aid of an interpreter that she has memory lapse issues and did not recall being present at the trial. She also did not have a specific recollection of the written statement she provided to PCR counsel in support of this application. That undated statement, was written in English, and Belina's signature was notarized. Bilina acknowledges she neither writes nor reads English.
>
> Luis, petitioner's brother, also testified through the aid of a Spanish language interpreter. He stated that he spoke to petitioner's trial counsel prior to the trial date about the events of the 2011 incident, and that he was present in the courtroom during the trial. His letter, dated August 12, 2015, in support of the PCR application, is also written in English, and according to him, was translated by a notary, who instructed him to sign it.
>
> . . .
>
> Petitioner testified and averred that he only met with trial counsel on three occasions from the time she was retained through the dates of the trial. He testified that he advised trial counsel of the alibi witnesses prior to the commencement of the trial and that she responded, *"We don't need to use the alibi witnesses. I got this. I will take care of this."*
>
> . . .

---

[4] The lawyer's name is spelled both "Peduto" and "Paduto" in the state court decisions; it appears "Peduto" is correct.

8

> Genesis Paduto, petitioner's trial counsel, testified that she has been a practicing attorney for twenty years, experienced in criminal law. She stated petitioner met with her on at least twenty occasions prior to the trial. The first time the issue of alibi witnesses arose was during jury selection when her client advised the court he had witnesses who would testify as to his whereabouts on the date of the incident. She promptly engaged an investigator to interview the proposed alibi witnesses. The investigator reported to her that petitioner's aunt (Bilina) had no recollection of the events of the incident and therefore would not be a viable alibi witness. After speaking to Bilina and Luis directly, she made a tactical decision not to call them as alibi witnesses because their proposed testimony *"did not make sense."*
>
> Of critical importance to Peduto was that during the many times she met with defendant he never mentioned alibi witnesses, but instead admitted he was present in the Hampton Inn parking lot when the incident occurred, but denied culpability as to the charges against him. Peduto testified she was bound by the Professional Code of Ethics; that she could not present knowingly false evidence to the court; nor could she suborn perjury to permit Luis to testify petitioner was with him in New York, despite petitioner's admissions to her to the contrary.

DE 16-9 at 24–25 (emphasis in original).

The court then set forth the *Strickland* standard, DE 16-9 at 25–26, and analyzed the claim as follows:

> [T]he function of the court is that of gatekeeper, assessing the credibility of the witnesses to make a determination whether or not such evidence should be presented to the jury. In that regard, the testimony from petitioner and Luis was uncorroborated, self-serving, and was contradicted by common experience and reason.
>
> The court accepts Peduto's testimony that she met with petitioner at least twenty times over the course of representing him. She had no motive to fabricate her testimony at the PCR hearing. . . . Parenthetically, Peduto was successful in obtaining an acquittal of the most serious charges lodged against petitioner in the indictment.
>
> As an officer of the court, Peduto was bound by the canons of ethics and if she presented knowingly false evidence to the court, she would have subject[ed] herself to criminal prosecution in addition to facing potential disbarment.
>
> Bilina had no recollection of the trial and the day when the incident occurred. Her recollection of the circumstances surrounding the creation of the letter in support of the PCR petition, written in English, was sketchy at best. Therefore, since she could not establish a foundation to introduce or authenticate the letter, it would be inadmissible hearsay at a subsequent trial. Moreover, the scrivener of that letter

> was not identified, nor was the scrivener's qualifications to translate and interpret in the Spanish language presented to the court. Accordingly, Bilina's testimony provided no competent credible evidence to support petitioner's alibi defense.
>
> In sum, the court assigns no weight and no credibility to the testimony of Belina, Luis and petitioner, while finding Paduto's testimony credible and rational, in light of the proceedings witnessed by this court during the status conferences, pre-trial conferences, jury selection, trial of the matter and the PCR hearing.
>
> For the above reasons, the court is satisfied the decision not to call the alibi witnesses at trial was tactical and not due to ineffectiveness or substandard performance. . . .

DE 16-9 at 26–27.

The Appellate Division affirmed. *Balcacer*, 2019 WL 2713129, at *4. The court briefly summarized the alibi witness testimony as follows:

> At the evidentiary hearing, defendant's aunt said she could not recall being at the trial, nor could she remember the written statement she had provided to defendant. She claimed she recalled, however, that on October 18, 2011, she saw defendant in his mother's house in New York City at 11:45 in the morning. This was the same time and date as the aborted drug deal/robbery.
>
> Defendant's brother testified that he remembered being at trial, and had spoken with trial counsel. He said on the date of the crime defendant had accompanied him to complete a construction job at approximately 1:00 p.m. in New York City. The notary who witnessed the alibi witnesses' signatures was not called. Presumably, it was the notary who translated the witnesses' statements into English.

*Balcacer*, 2019 WL 2713129, at *2. The court found that trial counsel's decision not to present alibi witnesses "was required by ethical considerations," and her decision was "a sound strategic one" because neither witness would have been credible. *Balcacer*, 2019 WL 2713129, at *3; *see also id.* at *2 ("Counsel 'realized that when [defendant] told me at first that he was there [that] was the truth and I was not going to present witnesses that I believe[d] were not telling the truth.'"); DE 16-26 at 51 (same). The court added the following comments:

> Defendant's aunt suffered from dementia and the likelihood that she would be believed was slim to none. The brother's testimony made little sense. Therefore, it

10

> was better to have no witnesses than witnesses who would cause the defense to lose all credibility.
>
> Counsel's decision fulfilled her ethical responsibilities to the system. See *In re Seelig*, 180 N.J. 234, 254–55 (2004). A lawyer has the right to refuse to present evidence he or she believes is false. RPC 3.3(c). A lawyer cannot cooperate in the commission of perjury, which includes falsification of evidence or assisting witnesses in giving false testimony. See RPC 3.4(b). We do not consider defendant's argument on this point to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

*Balcacer*, 2019 WL 2713129, at *3; *see also* DE 16-26 (PCR evidentiary hearing transcript).

To succeed on his claim that counsel was ineffective for not calling the proposed alibi witnesses, Balcacer must "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. The PCR court found counsel's reasons for deciding not to call the alibi witnesses were credible—that is, that her decision was both strategic and informed by ethical obligations. DE 16-9 at 27. The record amply supports these factual findings, which are presumptively correct. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 281 (3d Cir. 2016).

On this record, where the state courts found that trial counsel investigated the purported alibi witnesses, determined they were at best not credible and at worst actively lying because they contradicted what her client had told her, and made the strategic and ethical choice not to call them, the courts reasonably determined that counsel was not ineffective. *See Jordan v. Superintendent Coal Twp. SCI*, 841 F. App'x 469, 474 (3d Cir. 2021) (where counsel investigated and met with potential alibi witness, court found counsel "made a clear strategic choice" not to call witness); *Locus v. Johnson*, No. 18-11527, 2021 WL 1749466, at *30 (D.N.J. May 4, 2021) ("it is significant that defense counsel was aware of these witnesses before trial because it supports the conclusion that counsel made a strategic decision not to call the witnesses"); *Hayes v. Wenerowicz*, No. 13-589, 2015 WL 1636947, at *8 (W.D. Pa. Apr. 13,

11

2015) ("Our recounting of the evidence concerning trial counsel's efforts to locate the alibi witnesses and trial counsel's efforts to have her investigators interview Petitioner's alleged alibi witnesses and the evidence of record suggesting that there was a strategic decision not to call alibi witnesses would be more than sufficient to sustain the presumption that trial counsel acted reasonably. Given the record's silence as to any evidence of trial counsel lacking a reasonable basis for not presenting the alibi witnesses, Petitioner fails to sustain his burden to rebut the presumed reasonableness of trial counsel's actions.") (citation omitted). Indeed, given the PCR judge's finding that the proposed witnesses were not credible, counsel's decision not to call them appears to have been wise, as "a weak alibi is likely to do more harm than good." *Starks v. Davis*, No. 18-16525, 2020 WL 6707944, at *7 (D.N.J. Nov. 16, 2020); *see also Gilreath v. Bartkowski*, No. 11-5228 MAS, 2014 WL 4897053, at *10–11 (D.N.J. Sept. 30, 2014) (where counsel found "serious issues" as to potential alibi witness's "viability as a credible and supportive witness," "[t]he facts and circumstances of the case at the time of trial plainly show that [counsel's] decision was a strategic one that should not be challenged in hindsight").

This outcome is not disturbed, and indeed is reinforced, by counsel's consideration of her ethical obligations in making strategy decisions. Peduto testified that Balcacer told her that he had been present at the scene of the crime. DE 16-9 at 24–25; DE 16-26 at 44–48. The proposed alibi witnesses would have placed him elsewhere. It is not ineffective assistance to employ a defense strategy that eschews false testimony. *Nix v. Whiteside*, 475 U.S. 157, 174 (1986) ("On this record, the accused enjoyed continued representation within the bounds of reasonable professional conduct"; "at most he was denied the right to have the assistance of counsel in the presentation of false testimony"); *see also Card v. Dugger*, 911 F.2d 1494, 1503 (11th Cir. 1990) ("If counsel's failure to present testimony was motivated by a belief that an ethical obligation

precluded him from doing so and that belief was reasonable, then such conduct may not be considered deficient performance under *Strickland*."); *McRae v. Jackson-Mitchell*, No. 20-168, 2020 WL 5815893, at *6 (S.D. Ohio Sept. 30, 2020) (The state court "quite reasonably decided that failure to call the alibi witnesses was within reasonable performance parameters of defense counsel. Even if McRae had four witnesses who were prepared to testify he was elsewhere when the victim was murdered, defense counsel might well have believed . . . that the alibis would have been perjurious and of course an attorney has an ethical obligation not to present such testimony.").

On this record, the Appellate Division's finding that trial counsel's performance was not ineffective was not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of facts in light of the evidence presented. Likewise, it is not ineffective assistance for appellate counsel to not have raised this meritless claim on appeal. *Boyer v. Rozum*, No. 12-1532, 2015 WL 1137439, at *8 (W.D. Pa. Mar. 12, 2015) ("because Petitioner failed to establish his trial counsel's ineffectiveness, he cannot, *a fortiori*, establish his appellate counsel's ineffectiveness for failure to raise a meritless claim") (citation omitted). Accordingly, Balcacer is not entitled to relief on this claim.

### B.  Identification Claim

Balcacer argues trial counsel was ineffective for failing to seek a *Wade* hearing challenging the eyewitness identification of him. DE 6-6 at 22. At the January 2018 PCR hearing, the trial court rejected this argument, finding that "given the co-defendant's acquaintance with defendant, any challenge to identification, such as by a motion for a *Wade* hearing, would have been futile." *Balcacer*, 2019 WL 2713129, at *3. The Appellate Division summarily affirmed, adding only the following comments:

13

> Defendant next contends counsel was ineffective because she failed to demand a *Wade* hearing and failed to address any issues under *State v. Henderson*, 208 N.J. 208, 288-90 (2011). Under the circumstances as revealed in the trial transcripts, however, Judge Guida's decision was entirely correct. It would have made no sense for counsel to challenge identification by a co-defendant. The co-defendant may have had a motive to fabricate, but that has nothing to with the validity of defendant's identification. Additionally, the undercover detective had seen defendant on several occasions. Although defendant argued at trial that the officer could not have seen defendant clearly through tinted windows, the officer said he saw him through a clear glass windshield, and made a point of seeing him enough to be able to identify him.
>
> Thus, as the judge pointed out, it would have been futile for counsel to have requested these hearings. There was nothing ineffective about failing to make applications that would have been denied. *See State v. Drew*, 383 N.J. Super. 185, 202 (App. Div. 2006).

*Balcacer*, 2019 WL 2713129, at *3.

Reliability is the "linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 106, 114 (1977); *see also United States v. Wise*, 515 F.3d 207, 215 (3d Cir. 2008). The "purpose of a *Wade* hearing is to determine [before] the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification." *Lynn v. Bliden*, 443 F.3d 238, 248 (2d Cir. 2006) (citations omitted); *see also Neil v. Biggers*, 409 U.S. 188, 198 (1972); *United States v. Maloney*, 513 F.3d 350, 355 (3d Cir. 2008). If "identifications were entirely based upon observations at the time of the [incident] and not at all induced by" suggestive pretrial identification procedures, the subsequent in-court identification does not violate due process. *See Coleman v. Alabama*, 399 U.S. 1, 6–7 (1970). To demonstrate prejudice from counsel's failure to seek a *Wade* hearing, a petitioner "must show that he would likely have prevailed on [his] suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted." *Thomas v. Varner*, 428 F.3d 491, 502 (3d Cir. 2005).

This case simply does not present the *Wade* scenario. There is no indication of an impermissibly suggestive identification procedure. Indeed, as the state court pointed out, Balcacer was well known to his co-defendant and familiar to the undercover officer before the criminal conduct occurred.

Co-defendant Rodriguez testified that he had met Balcacer numerous times, specifically: he first met Balcacer "in New York"; "we ran into each other again approximately two or three months after"; "more or less three weeks before" the date of the crime, Rodriguez met with co-defendants, including Balcacer; and the day of the crime, he met Balcacer in the morning, and drove to the scene of the crime where they and another co-defendant "spoke about what we were going to do." DE 16-16 at 46–51. Given this exposure to Balcacer before and during the commission of the crime, the state courts reasonably found that Rodriguez's identification of Balcacer was reliable. *See also* DE 16-25 (PCR/trial judge stated: "[T]he co-defendant didn't identify this petitioner based on a series of photos. He basically identified him because he knew him and testified and then said yeah, he was with me that day. Not only was he with me at the event, we planned it in the morning. So there is no merit at all to the failure to request a . . . *Wade* . . . hearing so I find that doesn't rise to the level of prong one [of *Strickland*]."). Further, Detective Brian Kelly testified that he saw Balcacer at the scene of the crime and was "able to get a good look" at him, describing his height, weight, and gait. DE 16-18 at 71–72. Kelly further testified that when Balcacer fled the scene of the crime, he drew his gun "thinking he would maybe stop if he saw a gun, but he didn't. Then that was right in the front so I kind of stepped to the side and I tried to smash the window with my gun . . . ." *Id.* at 76. He testified that he was close enough to hit the car and that he "absolutely" got a good look at Balcacer and was able to see "[h]is whole face." *Id.*

On these facts, the Appellate Division reasonably found that it would have been futile for counsel to move for a *Wade* hearing. Accordingly, as Balcacer has failed to establish he would have prevailed on a suppression motion, the Appellate Division's rejection of Balcacer's identification claim was not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of facts in light of the evidence presented. *See Thompson v. Warren*, No. 12-4830, 2021 WL 2154867, at *8 (D.N.J. May 26, 2021) ("Petitioner has failed to present sufficient evidence to suggest that he would have prevailed on his suppression motion, and, therefore, his argument fails under *Strickland*. Contrary to Petitioner's claims, the record makes it abundantly clear that Johns was intimately familiar with Petitioner and had ample opportunity to view Petitioner both before and during the murder."); *Tiggs v. Johnson*, No. CV 15-8664 (KM), 2019 WL 1110812, at *11 (D.N.J. Mar. 8, 2019) ("Absent from this record is any threshold indication of an impermissibly suggestive identification procedure. . . . Two of the identifying witnesses knew Tiggs personally."); *Herrill v. Ricci*, No. 10-3575, 2016 WL 1183176, at *18 (D.N.J. Mar. 28, 2016) ("as the circumstances in this case show, the witnesses' identifications of [petitioner] as the shooter were not the result of suggestive identification procedures, but rather, were based on the witnesses' familiarity with [p]etitioner from the New Year's Eve party"). Habeas relief on this ground is denied.

### C. Right-to-Testify Claim

Balcacer argues that he was "coerced into forgoing his testimony due to trial counsel's ineffective representation." DE 6-5 at 6. The PCR judge, who was also the trial judge, rejected this claim, stating that he "recalled discussing with [Balcacer] his waiver of his right to testify, and his request that the jury be given the Model Jury Charge." *Balcacer*, 2019 WL 2713129, at *1. The judge concluded that "the record simply did not support a claim that Balcacer's waiver

16

was not knowing and intelligent." *Id*. The Appellate Division affirmed, stating that Balcacer's contention that he was inadequately advised of his right to testify, or coerced into giving up the right, "borders on the frivolous." The court found that the trial judge "extensively reviewed the decision with him, and ultimately, defendant on the record confirmed that he understood his choices, had decided not to take the stand, and wanted the Model Jury Charge given." *Id.* at *3. The court concluded: "This point is so lacking in merit as to not warrant further discussion in a written opinion." *Id.*

A criminal defendant has a constitutional right to testify. *Rock v. Arkansas*, 483 U.S. 44, 51 (1987). The right "is personal and can be waived only by the defendant, not defense counsel," and if the defendant chooses to waive this right, "the waiver must be knowing, voluntary and intelligent." *United States v. Leggett*, 162 F.3d 237, 245 (3d Cir. 1998); *see also United States v. Pennycooke*, 65 F.3d 9, 10 (3d Cir. 1995). The *Strickland* standard applies "when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify." *Palmer v. Hendricks*, 592 F.3d 386, 394 (3d Cir. 2010) (quotations and citation omitted).

Balcacer has not provided evidence that counsel coerced him into waiving his right to testify. To the contrary, the record amply supports the Appellate Division's finding that counsel adequately advised him of his right. In rejecting this claim, the PCR judge, who had also presided at trial, described his colloquy with Balcacer at trial as follows:

> I asked him on the record did you have a discussion with your attorney regarding whether you're going to testify or not.
>
> Did you have enough time to talk to your attorney? He answered yes and I asked him whether he was going to testify. I went over the options with him including that he could be cross-examined and that if he had a record it could be used against him for credibility.
>
> He chose not to testify. And he signed the form . . . indicating not only verbally but in writing that he had a discussion with his attorney and he chose not to testify.

17

> So to tell me now and . . . say Judge, I wanted to testify, but she won't let me it's just a [bare] allegation that does not raise to the level of prong one [of *Strickland*] at all.

DE 16-25 at 33. The actual transcript of the trial judge's colloquy with Balcacer is at DE 16-19, pp. 18–19.

As the record supports the state court's finding that Balcacer knowingly, voluntarily, and intelligently waived his right to testify at trial, the Appellate Division's finding that counsel was not ineffective was not unreasonable. *See Freeman v. Davis*, No. 18-8269, 2021 WL 4705009, at *22 (D.N.J. Oct. 7, 2021) ("The state court's factual determination [that] the record did not support Petitioner was not informed of her right to testify is entitled to considerable deference on habeas review."); *Starks v. Davis*, No. 18-16525, 2020 WL 6707944, at *7 (D.N.J. Nov. 16, 2020) ("Based both on counsel's credible testimony during PCR proceedings and Petitioner's colloquy with the trial court, the PCR courts rejected this claim, finding that counsel had adequately explained Petitioner's right to testify to him and that Petitioner, in light of counsel's adequate advice on the risks of testifying on his own behalf, had chosen not to take the stand and had confirmed that fact to the trial court."); *Prather v. Att'y Gen. of N.J.*, No. 18-16199, 2022 WL 1639080, at *11 (D.N.J. May 24, 2022) ("Petitioner fails to demonstrate that his counsel's performance was deficient" where "Petitioner fails to set forth any evidence that counsel coerced him into waiving his right to testify."); *Centeno v. Davis*, No. 16-2779, 2022 WL 865816, at *15 (D.N.J. Mar. 23, 2022) (petitioner failed to demonstrate ineffective assistance where he "relies solely on his own word, unsupported by anything in the record, that counsel falsely represented to the trial court that Petitioner made the choice not to testify"). Accordingly, habeas relief on this claim is denied.

### D. Cumulative Error Claim

Balcacer argues that the "cumulation of errors by trial counsel resulted in a fundamentally unfair process." DE 6-5 at 6. The Appellate Division rejected this claim, finding that "[c]ounsel did not commit any errors, and in fact, was remarkably successful in obtaining acquittal of the most serious charges . . . . As a result, despite having been indicted on at least one first-degree offense and many second-degree offenses, [Balcacer] had already been released from imprisonment at the time of his PCR hearing." *Balcacer*, 2019 WL 2713129, at *4. The court found Balcacer's argument that the aggregation of alleged errors warranted relief to be "so lacking in merit as to not warrant further discussion in a written opinion." *Id.*

The Appellate Division reasonably found that the claims of alleged errors discussed above were meritless, and noted that overall, counsel had been quite effective. Its rejection of Balcacer's cumulative error claim therefore was not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of facts in light of the evidence presented. *See United States v. Herrera-Genao*, 419 F. App'x 288, 296 (3d Cir. 2011) ("Herrera-Genao complains only of the cumulative effect of the preceding claims; because we have found no error regarding those claims, Herrera-Genao's claim of cumulative error also fails."); *United States v. Tiangco*, 225 F. Supp. 3d 274, 290 (D.N.J. 2016) ("I have considered the defendant's claims of error cumulatively. Individually, they do not raise a substantial possibility of prejudice. Taken together, they likewise do not suggest any prejudice, unfairness, or evidentiary insufficiency that would warrant a new trial or judgment of acquittal."). Habeas relief on this claim is denied.

19

## V. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Here, reasonable jurists would not find the Court's habeas ruling debatable. Accordingly, no certificate of appealability shall issue.

## VI. CONCLUSION

For the foregoing reasons, Balcacer's petition is denied and no certificate of appealability shall issue. An appropriate order follows.

DATED: December 19, 2022

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge